J-S01016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2313 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000012-2019,
FID No. 51-FN-004337-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2314 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002196-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2315 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000013-2019,
FID No. 51-FN-004337-2013

| IN THE INTEREST OF: K.T.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2316 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002194-2013

| IN THE INTEREST OF: T.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2317 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000014-2019,
FID No. 51-FN-004337-2013

| IN THE INTEREST OF: T.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2318 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002197-2013

| IN THE INTEREST OF: T.L.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |

|  | : |  |
| --- | --- | --- |
| APPEAL OF: T.D., MOTHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 2319 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000015-2019,
FID No. 51-FN-004337-2013

| IN THE INTEREST OF: T.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- | --- |
|  | : | |
|  | : | |
|  | : | |
| APPEAL OF: T.D., MOTHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 2320 EDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002198-2013

BEFORE:   BOWES, J., KUNSELMAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MARCH 30, 2020**

In this difficult matter, T.D. (Mother) appeals the orders terminating her parental rights to her four children: 12-year-old son K.T.L.S.; 11-year-old daughter T.A.K.D.; 10-year-old daughter T.R.D.; and seven-year-old son

---

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

T.L.D. (collectively, the Children).[1, 2] After the underlying dependency cases lingered for nearly five years, the trial court asked the parties to brief the issue of whether the Children were still dependent, or alternatively, whether the matter was essentially a custody dispute between Mother and Paternal Grandmother, the placement caregiver. Soon thereafter, the Children's guardian *ad litem* filed termination petitions, and the Philadelphia Department of Human Services (DHS) filed petitions for Permanent Legal Custodianship. Following a two-day hearing, the court granted the termination petitions pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b) and denied the petitions for permanent legal custodianship. Although DHS supports Mother's appeal, arguing that a Permanent Legal Custodianship would be in the Children's best interests, DHS did not file its own appeal. After careful review, we affirm.

The trial court set forth the extensive factual background and procedural history of this case in its thorough opinion filed on September 13, 2019, pursuant to Pa.R.A.P. 1925(a). **See** Trial Court Opinion, 9/13/19, at 1-36; **see generally** at 1-57. Pertinently, the case came to the attention of DHS in 2013 following a general protective services report. The report indicated neglect,

---

[1] The court also terminated the rights of K.N.D.S. (Father), who does not appeal.

[2] Mother appealed from both the termination and dependency dockets, suggesting that Mother intended to appeal not only the termination of her rights, but also the court's decision to change the goal of the litigation from parental reunification to adoption. As we clarify below, Mother's brief confined her challenges only to the terminations.

truancy, unsafe shelter, and emotional harm from the circumstances surrounding the alleged maltreatment.

Complicating matters were the facts that Mother admitted to having mental health issues, and that three of the four Children suffered from a variety of medical problems, some significant. T.L.D. was diagnosed with Down Syndrome, among a slew of other ailments, and requires a gastrostomy tube (G-tube) in order to safely consume liquids. K.T.L.S. had a congenital skull defect such that only skin was protecting a portion of his brain. He also has severe allergies, asthma, and ocular issues. T.A.K.D. also has ocular issues and attends a school for the visually impaired. The court adjudicated the Children dependent in November 2013.

The court placed the Children in the home of the Paternal Grandmother. To reunify Mother with the Children, the court identified several objectives for Mother to achieve in her Single Case Plan. Specifically, Mother had to complete a parenting class, sign up for job placement, and obtain suitable housing. The court further ordered Mother to receive medical training prior to having unsupervised visits with T.L.D. because of his medical needs. The court granted Mother liberal supervised visits with the Children at Paternal Grandmother's home on a bi-weekly basis.

Over the next 17 months, Mother made slow but steady progress. By April 2015, Mother had appropriate housing and she was employed. Mother received medical training and completed parenting classes. She was permitted to participate in the Children's school meetings and medical

appointments. Thus, the dependency court permitted Mother unsupervised day visits in the community and in her home.

However, in late July 2015, T.L.D. suffered second-degree burns on his chest and stomach during an unsupervised, overnight visit at Mother's home. T.L.D. was evidently scalded by hot water in a kitchen accident. Mother did not tend to the injury, and T.L.D. only received medical attention after the Children returned to Paternal Grandmother, who then took T.L.D. to the hospital. The court reduced Mother's visits following the incident.

By February 2016, the court granted Mother weekly supervised visitation in the community and ordered Mother to attend family therapy. In May 2016, the court determined Mother was substantially compliant with her objectives and granted Mother unsupervised visits.

At the November 2016 permanency review hearing, the court noted that DHS did not plan to file termination petitions because termination did not serve the Children's needs and welfare. DHS's compelling reason was that permanent legal custodianship was a more appropriate goal.

Over the next two years, Mother's visitation vacillated between unsupervised and supervised. The Children did not want to engage in therapy with Mother, nor did they always want to visit with her. Additional safety concerns also arose. For example, Paternal Grandmother alleged that the Children once told her T.L.D. almost drank bleach; Mother explained that T.L.D. had been in the bathroom where there was an uncapped bleach bottle, but that T.L.D. had not attempted to drink it. T.A.K.D. also testified that

Mother had called her a liar for alleging that Mother's stepdaughter was sexually inappropriate with her.

At the October 2018 permanency review hearing, the two oldest children (12-year-old K.T.L.S. and then-10-year-old T.A.K.D.) testified that they did not wish to visit Mother, but wished to remain with Paternal Grandmother on a permanent basis. T.A.K.D. stated she was open to mending her relationship with Mother sometime in the future, but that did not presently want to participate in family therapy. At the conclusion of the October 2018 permanency review hearing, the trial court asked the parties to brief the issue of whether dependency still existed or whether the case was merely a custody matter.

On January 3, 2019, the Children's guardian *ad litem* filed terminations and goal change petitions; DHS filed permanent legal custodianship petitions on January 18, 2019. The court conducted a hearing over two dates on April 17 and July 18, 2019. At the hearing, the Children were appointed legal counsel in addition to their guardian *ad litem.* At the conclusion of the hearing, the court entered its termination and goal change orders, and denied the petitions for permanent legal custodianship.

Mother timely filed these appeals.

> 1. Whether the trial court committed reversible error, when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(a)(1) and (2)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the [C]hildren as required by the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(b)[?]

3. Whether the trial court erred because the evidence was overwhelming and undisputed that [M]other demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with her [C]hildren[?]

Mother's Brief at 4.

In reviewing an appeal from the termination of parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite

- 8 -

> result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Before we begin our analysis, we must address a number of defects with Mother's appeals:

First, we note an error in Mother's concise statement as it pertains to T.A.K.D. There, Mother listed K.T.L.S.'s name in the caption, but kept T.A.K.D.'s name in the body of the statement. Because this is a self-evident clerical error, and because Mother correctly appealed from each Child's correct docket, we conclude that the error is harmless.

Second, notwithstanding notices of appeal from each child's respective dependency and termination docket, we must assume Mother challenges only

the termination orders. Viewing the argument section of her brief in a generous light, it appears Mother consolidated her third appellate issue with her second issue, which pertains to Section 2511(b). Viewed another way, however, Mother completely abandons the third issue, rendering us completely unable to decipher whether she intended to challenge the court's goal change orders in addition to the termination orders. ***See Commonwealth v. McCree***, 854 A.2d 188, 192 (Pa. Super. 2004) ("When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review."). We conclude that if Mother did intend to challenge the Children's goal change orders, those challenges are waived.

Third, and most fatal to her appeals, Mother's brief only preserves her challenges to the court's terminations under Section 2511(a)(1) and (2), even though the court terminated Mother's rights under Sections 2511(a)(1), (2), (5), and (8). Although Mother's concise statement challenged all four termination grounds, her brief has no mention of Section 2511(a)(5) or (8) in either the statement of questions involved, or in the argument section.

Rule of Appellate Procedure 2116 provides that the statement of the questions involved must state concisely the issues to be resolved; and no question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby. Pa.R.A.P. 2116(a). Rule 2119 provides that the argument shall be divided into as many parts as there are questions to be argued; and each part shall be followed by such discussion and citation of authorities as are deemed pertinent. Pa.R.A.P. 2119(a). It is well

established that failure to adhere to these rules may constitute waiver. ***See Lackner v. Glosser***, 892 A.2d 21, 29-30 (Pa. Super. 2006); ***see also Gurley v. Janssen Pharmaceuticals, Inc.***, 113 A.3d 283, 288 n.11 (Pa. Super. 2015) (issue is waived for purposes of appellate review when an appellant does not develop it in brief).

Here, we must find waiver. We cannot ignore this defect by concluding that the missing issues – Section 2511(a)(5) and (a)(8) – are "fairly suggested" by the issues Mother briefed. Each ground for termination under Section 2511(a) is unique and has developed a distinct body of case law. Indeed, Mother seems to appreciate this, as the argument portion of her brief concerning Section 2511(a) is divided into subparts: one to address Section 2511(a)(1) and another to address (a)(2). Noticeably absent, however, are subparts addressing Section 2511(a)(5) or (a)(8).

Mother's failure to argue these sections is significant, because termination requires a bifurcated analysis. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfied the statutory grounds for termination delineated in Section 2511(a). The court only engages in the second part of the analysis under Section 2511(b) if the court determines that a parent's conduct warrants termination under Section 2511(a). ***See In re C.M.K.***, 203 A.3d 258, 261 (Pa. Super. 2019). Importantly, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Thus, Mother's failure to address Section 2511(a)(5) and (a)(8) effectively means the trial court's decisions under those sections stand. As such, Mother forfeits her entire challenge under Section 2511(a) and confines the success of her appeals to the arguments under Section 2511(b).

Even if we did not find waiver, the termination of Mother's rights would still be warranted under Section 2511(a)(2).[3] In sum, Mother concedes that past incapacity has caused the Children to be without parental care, but contends that such incapacity has been remedied. She argues that she availed herself of every service available to her in order to be reunified with the Children. **See** Mother's Brief at 17-18; **see also, e.g., C.M.K.**, 203 A.3d at

---

[3] Section 2511 provides, in relevant part:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. §2511(a)(2).

262 (providing three requirements to prove termination under Section 2511(a)(2)).[4] Notwithstanding Mother's efforts to overcome her incapacity, the trial court determined Mother was not capable of parenting these Children with specialized needs, nor could Mother remedy such incapacity. We agree. Thus, even if Mother did not forfeit her challenge to the terminations under Section 2511(a)(5) and (8), we would conclude that the trial court did not abuse its discretion by terminating Mother's rights under Section 2511(a)(2).

Next, we turn to the second prong of the termination analysis under Section 2511(b): determination of the needs and welfare of the child under the standard of the best interests of the child. *C.M.K.* 203 A.3d at 262 (citation omitted). That section provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §2511(b).

_____

[4] To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *Id.* at 262.

Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *C.M.K.*, 203 A.3d at 262 (citation omitted).

Mother argues that the record "does not reflect clear and convincing evidence that there was no parent bond." Mother's Brief at 18-19. She also points to Section 2511(b)'s instruction that no termination can be based solely on "environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." *See* 23 Pa.C.S.A. § 2511(b). Finally, if we are to consider Mother's third claim as an ancillary component of her Section 2511(b) challenge, Mother claimed that the evidence was overwhelming and undisputed that she demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with the Children. *See* Mother's Brief at 4. These arguments are largely misplaced.

For one, Mother's own feelings are unconnected to this portion of the analysis. As stated above, this portion of the analysis no longer concerns her conduct. *See C.M.K.*, *supra*. More to the point, "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

Moreover, Mother misconstrues the inquiry into the parental bond. The question is not simply whether a bond exists. As we have said:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship.

*In re N.A.M.*, 33 A.3d at 103 (quotations and citations omitted).

Additionally, consideration must be paid to the continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *Id.* With the relevant standards properly identified, we address Mother's claim that the court erred by granting termination under Section 2511(b).

We begin our analysis by noting the Children's extensive issues and the necessity for specialized care. Seven-year-old T.L.D.'s care is the most involved. Dr. Mary Fabio, his physician, has treated T.L.D. since his birth and described him at the termination hearing as "a very complex patient and has a lot of different needs." N.T., 4/17/19 (Day 1), at 60. His diagnoses include: Down Syndrome; obstructive sleep apnea; reflux; asthma; allergies; and severe developmental delays. *Id.* at 44. He is prescribed medications for allergies, reflux with aspiration, and behavioral issues. While T.L.D. was nearly eight years old, he functions at a much lower level, which is difficult to

quantify because his language is impaired. He needs support in his daily living beyond simply needing help to dress and undress. *Id.* at 84. T.L.D. cannot be left unattended because he does not possess the problem-solving skills to keep himself safe. *Id.*

He's treated by a number of medical specialists including occupational and physical therapists. Because of his obstructive sleep apnea, T.L.D. uses a CPAP machine to keep his airway open. *Id.* at 45-46. His caregiver needs to be trained on how to use the mask, how to keep it on him, and how to clean and maintain the machine. *Id.* at 46-47. Because of T.L.D.'s reflux, liquids were going into his lungs making it unsafe for him to consume any liquids by mouth. *Id.* at 48. He had to have surgery to have a G-tube and ear tubes placed, along with a tonsillectomy and adenoidectomy. *Id.* at 48-49. His caregiver must be trained on how to connect the G-tube to the feeds, how to keep it clean, and how to protect and replace the tube if T.L.D. pulls it out. *Id.* at 49. Since the Children were placed with Paternal Grandmother, T.L.D. has had 120 medical appointments. *Id.* at 51. Of those, Paternal Grandmother has attended all of them; Mother has only attended 10, although that number could be as high as 16 as there were six visits where the doctor's notes did not specify who accompanied T.L.D. *Id.* at 50-51.

Twelve-year-old K.T.L.S. had a congenital defect where portions of bones were absent from his skull, resulting in only skin covering his brain. *Id.* at 61, 64. Although Mother was aware of this condition while K.T.L.S. was in her care, Mother did not appreciate the danger and the condition was not

surgically corrected until he was out of Mother's care. *Id.* at 63-65. K.T.L.S. also suffers from vision loss, severe asthma, eczema and a behavior disorder. He also has a number of food allergies, which led to multiple episodes of anaphylaxis while he was with Mother. *Id.* at 61-62. His allergies require immunotherapy in the form of injectable medication every two weeks. *Id.* at 62-63. Since being in Paternal Grandmother's care, K.T.L.S. has received treatment and his conditions have been controlled.

Eleven-year-old T.A.K.D. has severe myopia and requires care by an ophthalmologist. She attends a special school for the visually impaired, and will be eligible for corrective eye surgery when she turns 12. Ten-year-old T.R.D. does not have any medical issue requiring a specialist, but she does have an IEP at school, as do T.A.K.D. and T.L.D.

Mother largely ignored these issues, or perhaps more accurately, she failed to appreciate them, sometimes putting the Children's safety in jeopardy. In one incident, when Mother was finally entrusted with unsupervised visits in her home, T.L.D. returned to Paternal Grandmother's care with untreated second-degree burns from a kitchen accident, which required immediate medical attention. *Id.* at 58-59. Mother contends that the deplorable housing conditions which had led to the Children's removal have remedied (she now lives with her husband). However, the Children do not feel safe in Mother's home, nor do they feel safe with Mother.

At the permanency review prior to the termination hearing, K.T.L.S. testified Mother lives in a house where one of his cousins was sexually

assaulted by a neighbor. *See* N.T., 7/18/19 (Day 2), at 30-33. T.A.K.D. testified that Mother's stepdaughter sexually assaulted her while in this home. *Id.* at 92. T.A.K.D. also recounted incidents where T.L.D. almost drank bleach, and where K.T.L.S. had gotten sick (presumably on account of the food allergies) and was bitten by bedbugs. *Id.*, at 88. It was clear from the 11-year-old's testimony that she fears for her and her siblings' safety.

Having articulated the Children's unique developmental, physical and emotional needs, we observe that the three older children all expressed a desire to be adopted by Paternal Grandmother. At the termination hearing, the court heard testimony from Victoria Fernandez, the psychotherapist who had been involved with the family since December 2013. She specifically worked with the oldest siblings, K.T.L.S. and T.A.K.D.

Ms. Fernandez testified that therapy sessions with K.T.L.S. were positive because he was able to express his needs, his feelings, his health and his relationship with Mother. *See* N.T. (Day 1), at 103. However, he refused to participate in family therapy with Mother, and he expressed a desire to stay with Paternal Grandmother. *Id.* at 36-37. Indeed, K.T.L.S. testified at the termination hearing that Paternal Grandmother "became more of a parent to me than basically I even felt with my parents before. So in my opinion adoption would be the best thing for me to like handle." N.T. (Day 2), at 83. He had also expressed to Ms. Fernandez that if he had to return to Mother he would run away. N.T., (Day 1), at 107. Ms. Fernandez concluded that termination and adoption would be in K.T.L.S.'s best interest because, "it is

time for him to have something stable and for him to have his life where he's not fearful of his circumstances." *Id.* at 107-108.

Ms. Fernandez's sessions with T.A.K.D. focused on her imbalanced relationship with Mother, because Mother told T.A.K.D. that she was the result of an unwanted pregnancy. *Id.* at 95-97. T.A.K.D. said she knew her mom didn't want her. *Id.* at 96. She also expressed that she and her siblings are safer with Paternal Grandmother than with Mother. In one incident during a visit in Mother's home, T.A.K.D. alleged that Mother's stepdaughter was sexually inappropriate with her. *Id.* at 97-100. T.A.K.D. claimed that Mother called her a liar. N.T. (Day 2), at 92. Like K.T.L.S., T.A.K.D. also wished to be adopted by Paternal Grandmother. *Id.* at 90. Ms. Fernandez concluded that both of these siblings were totally bonded to Paternal Grandmother, and that they would not suffer irreparable harm if Mother's rights were terminated.

Melissa Martin, the child advocate social worker assigned to the family's case, testified that she has spoken with K.T.L.S., T.A.K.D., and ten-year-old T.R.D. Like the two oldest siblings, T.R.D. also expressed to Ms. Martin that she wanted to be adopted by Paternal Grandmother. *Id.* at 174. To that end, Julie Rose, Esq., the Children's child advocate, explained to the court that she addressed the concept of adoption with T.R.D., and that T.R.D. wanted to be adopted.

Seven-year-old T.L.D. could not express his thoughts because of his intellectual disability. Dr. Alison Downes, a physician in the Department of Developmental and Behavioral Pediatrics at Children's Hospital of Philadelphia,

also treats T.L.D. for his intellectual disability, as well as his ADHD, muscle weakness and ligament laxity. At the termination hearing, all parties stipulated to her expertise in developmental pediatrics. *See* N.T. (Day 1), at 74-76. Dr. Downes noted that T.L.D. was nearly eight years old, but functions at a lower level, which is hard to quantify because his language is impaired. *Id.* at 80.

She testified that Mother has never attended T.L.D.'s appointments, nor has she ever been contacted by Mother to discuss his condition or treatments. *Id.* at 83-84. However, Dr. Downes testified that she observed Paternal Grandmother with T.L.D., that they are very well-connected, that T.L.D. is very affectionate with her and responds well to all of her directions. Dr. Downes opined that T.L.D's needs are significant and must be understood. *Id.* at 86. She indicated that Paternal Grandmother is an excellent advocate for his special needs, and that T.L.D.'s development has been due in large part to Paternal Grandmother's emphasis on learning. *Id.* at 83. She opined further that he is quite attached to Paternal Grandmother, as well as his siblings, and cannot imagine what it would be like if that support system changed. *Id.* at 86.

Although the courts do not defer termination decisions to the children involved in the proceedings, we note that these Children's preferences were essential to the court's decision to favor termination over permanent legal custodianship. *See* T.C.O. at 54. It is of no surprise that the Children all favor termination and adoption (with the exception of T.L.D., of course)

because Paternal Grandmother has attended to their significant developmental, physical, and emotional needs.

Mother argues that termination is not warranted, because environmental factors like "medical care" and "inadequate housing" cannot be the basis for termination if they are beyond her control, pursuant to 23 Pa.C.S.A. § 2511(b). *See* Mother's Brief at 18. Mother misreads the statute. Section 2511(b) provides that the rights shall not be terminated *solely* on the basis of environmental factors. *See* 23 Pa.C.S.A. § 2511(b) (emphasis added). But these factors are relevant to the analysis, especially here, where the Children's needs are atypically more involved.

More concerning is that Mother has never evinced a meaningful intention to address the Children's developmental, physical, and emotional needs. She has hardly attended any of the Children's many medical appointments or educational meetings, nor had she reached out to the specialists to discuss treatment or progress. *See* N.T. (Day 2), at 254-255. And contrary to her statement, Mother has not availed herself of the services that would have provided her the ability to attend. Consequently, the record supports the trial court's determination that termination was warranted under Section 2511(b).

To conclude: we find Mother waived her challenge to Section 2511(a) for failure to address termination under Section 2511(a)(5) and (a)(8), although we would have concluded termination was warranted under Section 2511(a)(2). Likewise, we conclude Mother waived her challenge to the court's goal change, if she meant to bring one at all. Finally, we conclude that the

record support's the court's determination that termination was warranted under Section 2511(b).  We discern no abuse of discretion.

Orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 3/30/2020*